# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 23-2971, 23-2972

IN RE LTL MANAGEMENT LLC,

*Debtor,*

---

AD HOC COMMITTEE OF SUPPORTING COUNSEL,

*Appellant,*

– v. –

OFFICIAL COMMITTEE OF TALC CLAIMANTS, PAUL CROUCH, THE AD HOC GROUP OF MESOTHELIOMA CLAIMANTS, MESOTHELIOMA CLAIMANTS REPRESENTED BY MAUNE RAICHLE HARLEY FRENCH & MUDD LLC, THE STATES OF NEW MEXICO AND MISSISSIPPI, CLAIMANTS REPRESENTED BY ARNOLD & ITKIN LLP, THE AD HOC COMMITTEE OF STATES HOLDING CONSUMER PROTECTION CLAIMS, CLAIMANTS REPRESENTED BY THE BARNES LAW GROUP and THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF NEW JERSEY,

*Appellees.*

---

ON GRANT OF PETITION FOR AUTHORIZATION OF DIRECT APPEAL FROM ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY, CH. 11 NO. 23-12825

---

## BRIEF FOR APPELLANT
## AD HOC COMMITTEE OF SUPPORTING COUNSEL

---

KRISTOPHER M. HANSEN
RYAN P. MONTEFUSCO
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
krishansen@paulhastings.com
ryanmontefusco@paulhastings.com

MATTHEW M. MURPHY
MATTHEW MICHELI
PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
(312) 499-6000
mattmurphy@paulhastings.com
mattmicheli@paulhastings.com

*Counsel to AHC of Supporting Counsel*

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (324414)

MICHAEL D. SIROTA
WARREN A. USATINE
SETH VAN AALTEN
JUSTIN ALBERTO
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
jalberto@coleschotz.com

LENARD M. PARKINS
CHARLES M. RUBIO
PARKINS & RUBIO LLP
700 Milam Street, Suite 1300
Houston, Texas 77002
(713) 715-1660
lparkins@parkinsrubio.com
crubio@parkinsrubio.com

*Counsel to AHC of Supporting Counsel*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 of the Federal Rules of Appellate Procedure and 26.1 of the Third Circuit Local Appellate Rules, counsel for Appellant hereby states that the Ad Hoc Committee of Supporting Counsel (the "AHC of Supporting Counsel" or the "AHC") is comprised of seventeen law firms representing more than approximately 57,000 individual claimants in the underlying chapter 11 case of LTL Management LLC.  The entities comprising the AHC are listed below.

1.      Andres Pereira Law Firm

2.      Andrews & Thornton

3.      De la Rosa Law Firm

4.      Ferrer Poirot & Wansbrough

5.      Heninger Garrison Davis, LLC

6.      Johnson Law Group

7.      Linville Law Group

8.      McDonald Worley PC

9.      Nachawati Law Firm

10.     OnderLaw, LLC

11.     Paul LLP

12.     Pulaski Kherkher, PLLC

13.     Rueb Stoller Daniel

14.     Singleton Schreiber

15.     Slater Slater Schulman LLP

16.     Trammell PC

17.     Watts Guerra LLP

No publicly held companies own 10% or more of the stock of any of the members of the AHC.

As it relates to the AHC's involvement, no publicly held corporation has a financial interest in the outcome of this proceeding.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ...................................................... 3

STATEMENT OF ISSUES ................................................................... 4

STATEMENT OF RELATED CASES AND PROCEEDINGS .............. 5

STATEMENT OF THE CASE ............................................................... 5

I.    The History of the Debtor's Talc Personal Injury Claims ............... 5

II.   The 2021 Chapter 11 Case ............................................................... 8

III.  The Debtor's Decision to File This Chapter 11 Case ...................... 9

    A.    The Debtor's Change in Circumstances ................................. 12

    B.    The AHC of Supporting Counsel's Intervention & Settlement
        Progress ................................................................................. 13

    C.    The 2023 Dismissal Opinion and Order ................................. 17

STANDARD OF REVIEW .................................................................. 18

SUMMARY OF ARGUMENT ............................................................ 18

ARGUMENT ...................................................................................... 20

I.    The Ad Hoc Committee of Supporting Counsel Has Standing to
    Appeal the Dismissal Order .......................................................... 20

    A.    The Third Circuit Need Not Reach the AHC's Standing
        Given the Debtor's Appeal and the Appellants' Common
        Arguments .............................................................................. 21

    B.    Even if Standing is Addressed, the AHC Satisfies All
        Requirements to be Heard Here ............................................. 23

        1.    The AHC Clients Are "Persons Aggrieved" ................... 23

        2.    The AHC Satisfies Third-Party Standing Exceptions ..... 24

i

C.    The AHC of Supporting Counsel Also Constitutes a "Person Aggrieved" In Its Own Right .................................................30

II.    The Bankruptcy Court Erred In Concluding That Section 1112(b)(2) Was Not, And Could Not Be, Satisfied .........................................31

A.    The Section 1112(b)(2) Exception Applies to "Bad Faith" Dismissals.................................................................................32

B.    Unusual Circumstances Exist Such that Dismissal is Not in the Best Interest of the Creditors and the Estate .................................35

C.    Any Purported Act Or Omission Constituting Cause, Including Alleged Bad Faith, is Justified ...........................................40

D.    Any Purported Act Or Omission Constituting Cause, Including Alleged Bad Faith, Can be Cured .......................................42

E.    There is a Significant Likelihood that the Plan will be Confirmed Within a Reasonable Period of Time ...............................44

CONCLUSION .................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amato v. Wilentz*,
  952 F.2d 742 (3d Cir. 1991) ..........................................................................25

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)...................................................................................37

*Bowman v. Wilson*,
  672 F.2d 1145 (3d Cir. 1982) ....................................................................26

*Caplin Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989).............................................................................. 27, 29

*Green v. Howard Family Tr. (In re Green)*,
  No. 15-1349, 2016 WL 6699311 (B.A.P. 9th Cir. Nov. 9, 2016)................34

*Horne v. Flores*,
  557 U.S. 433 (2009)...................................................................................21

*In re 1121 Pier Village LLC*,
  635 B.R. 127 (Bankr. E.D. Pa. 2022) .......................................................35

*In re 15375 Mem'l Corp. v. Bepco, L.P.*,
  589 F.3d 605 (3d Cir. 2009) ......................................................................18

*In re Boy Scouts of America*,
  35 F.4th 149 (3d Cir. 2022) .......................................................................23

*In re Federal-Mogul Global, Inc.*,
  684 F.3d 355 (3d Cir. 2012) ......................................................................44

*In re Fisher*,
  No. 07-61338-11, 2008 WL 1775123
  (Bankr. D. Mont. Apr. 15, 2008) ...............................................................35

*In re Global Indus. Techs.*,
  645 F.3d 201 (3d Cir. 2011) ................................................................ 26, 27

*In re Hinesley Family Ltd. P'ship No. 1*,
  460 B.R. 547 (Bankr. D. Mont. 2011).......................................................34

*In re IT Group, Inc.*,
  448 F.3d 661 (3d Cir. 2006) ......................................................................18

*In re Keith*,
No. 10-61722-11, 2010 WL 3835003
(Bankr. D. Mont. Sept. 29, 2010) ...................................................................34

*In re Korn,*
523 B.R. 453 (Bankr. E.D. Pa. 2014) ........................................ 34, 35, 38, 39

*In re LTL Mgmt., LLC,*
58 F.4th 738 (3d Cir. 2023) *as amended by*
64 F.4th 84 (3d Cir. 2023) ................................................................... *passim*

*In re LTL Mgmt., LLC,*
637 B.R. 396 (Bankr. D.N.J. 2022) .................................................................8

*In re McTiernan,*
519 B.R. 860 (Bankr. D. Wyo. 2014)............................................................39

*In re New Towne Dev., LLC,*
404 B.R. 140 (Bankr. M.D. La. 2009)..................................................... 40, 44

*In re Orbit Petroleum, Inc.,*
395 B.R. 145 (Bankr. D.N.M. 2008) ...................................................... 39, 44

*In re Pittsfield Weaving Co.,*
393 B.R. 271 (Bankr. D.N.H. 2008)...............................................................35

*In re PWS Holding Corp.,*
228 F.3d 224 (3d Cir. 2000) ..........................................................................23

*In re Quigley Co., Inc.,*
391 B.R. 695 (Bankr. S.D.N.Y. 2008) ...........................................................30

*In re SGL Carbon Corp.,*
200 F.3d 154 (3d Cir. 1999) ..........................................................................18

*In re Sherwood,*
No. 04-50584, 2008 WL 2074098 (Bankr. W.D. Mo. May 14, 2008) .........39

*In re The 1031 Tax Group, LLC,*
374 B.R. 78 (Bankr. S.D.N.Y. 2007) .............................................................35

*In re Wilderness Crossings, LLC,*
440 B.R. 484 (Bankr. W.D. Mich. 2010) .......................................................39

*In re Zohar III, Corp.,*
631 B.R. 133 (Bankr. D. Del. 2021)...............................................................25

*Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),*
    843 F.2d 636 (2d. Cir. 1988) ........................................................ 30

*King v. Governor of N.J.,*
    767 F.3d 216 (3d Cir. 2014) ........................................................ 25

*Medford Vill. East Assocs., LLC v. Medford Crossings N. LLC,*
    No. CIV. 08-4803, 2009 WL 1687165 (D.N.J. June 15, 2009) ................... 22

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) .................................................................. 37

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.,*
    280 F.3d 278 (3d Cir. 2002) .................................................... 25, 28

*Powers v. Ohio,*
    499 U.S. 400 (1991) ............................................................ 24, 25-26

*Ryan Turner Investments v. Jackson Durham Floral-Event Design,*
    No. 3:20-00400, 2021 WL 602908 (M.D. Tenn. Feb. 16, 2021) ................ 24

*Sec'y of the Interior v. California,*
    464 U.S. 312 (1984) .................................................................. 21

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ............................................................... 24, 30

*United States v. Cardales-Luna,*
    632 F.3d 731 (1st Cir. 2011) ...................................................... 32

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .................................................................. 22

*Virginia v. American Booksellers Ass'n,*
    484 U.S. 383 (1988) .................................................................. 29

**Statutes & Other Authorities:**

11 U.S.C. § 524(g) ...................................................................... 43

11 U.S.C. § 524(g)(4)(B)(i) .......................................................... 43

11 U.S.C. § 1109 ........................................................................ 27

11 U.S.C. § 1112(b) .......................................................... 17, 18, 35

11 U.S.C. § 1112(b)(1) ................................................................. 33

11 U.S.C. § 1112(b)(2)......................................................................... *passim*

28 U.S.C. § 157(a) ....................................................................................3

28 U.S.C. § 157(b) ....................................................................................3

28 U.S.C. § 157(d)(2)(A)...........................................................................4

28 U.S.C. § 158(d)(2)(A)(i) .......................................................................3

28 U.S.C. § 158(d)(2)(A)(iii) .....................................................................3

28 U.S.C. § 1334(a) ...................................................................................3

140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994)......................................43

## <u>INTRODUCTION</u>

The Ad Hoc Committee of Supporting Counsel (the "AHC of Supporting Counsel" or the "AHC") is comprised of seventeen law firms that collectively represent more than 57,000 talc claimants in this bankruptcy case (the "Chapter 11 Case")—a majority of all current talc victims with claims against LTL Management, LLC ("LTL" or the "Debtor").

One member of the AHC of Supporting Counsel was among the first to file a talc lawsuit against Johnson & Johnson ("J&J") and its affiliated entities nearly a decade ago, having since been at the forefront of talc litigation in the years that followed. And certain members of the AHC of Supporting Counsel were previously aligned with those who sought dismissal of LTL's first bankruptcy case (the "2021 Chapter 11 Case") in their successful appeal to this Court last year.

Those and all other members of the AHC of Supporting Counsel, acting on behalf of their tens of thousands of clients, now *support* the Debtor's effort to resolve its talc liability through bankruptcy, after having struck a generational agreement with LTL and J&J pursuant to which all current and future talc claimants would receive prompt, fair and complete payment on account of the injuries they have suffered.

It is in large part because of this support that the Chapter 11 Case—even if subject to dismissal for cause, which it is not—should have been permitted to

proceed to plan confirmation under section 1112(b)(2) of the Bankruptcy Code, which provides an alternative to dismissal where, as here, unusual circumstances make it such that continuing the bankruptcy case would be in the best interest of all creditors.

Contrary to the Bankruptcy Court's ultimate assessment, that standard is plainly met.    While the Bankruptcy Court correctly assumed that "unusual circumstances" exist given the nature of the talc liability leading up to the Chapter 11 Case, as well as the fact that it would be impossible to resolve the same on a global basis in the tort system, the Bankruptcy Court, relying on its interpretation of this Court's earlier opinion in the 2021 Chapter 11 Case, erred in finding that the "cause" purportedly supporting dismissal could not be excused under the present circumstances.

Indeed, the facts and circumstances leading up to the Debtor's second filing materially differ from those previously considered by this Court, and differ in a way that compels the opposite conclusion under section 1112(b)(2).    While this Court previously found it could not *currently* see" how the Debtor's lack of financial distress could be "overcome," *i.e.,* justified and cured, the record *now* before the Court plainly demonstrates that the "cause" purportedly supporting dismissal should be excused.

Particularly given the "fine line" that this Court found to exist between a proper, early filing, on the one hand, and an abusive, premature filing, on the other, the Debtor was *justified* in filing the Chapter 11 Case because it waited to do so until, and only after, reaching a global settlement agreement with counsel to a majority of talc claimants, and securing their support for a plan of reorganization consistent with the terms thereof. To that same end, any perceived objection to the Debtor's filing would be *cured* upon LTL's confirmation of a plan providing fair compensation to all current and future talc claimants, which itself would require a super-majority supporting vote.

For all of these reasons, and because the Debtor was poised to confirm a plan of reorganization consistent with its agreement with the AHC of Supporting Counsel as of the time the Bankruptcy Court issued its order of dismissal, the Bankruptcy Court's decision should be reversed and the *victims* here, a substantial majority of whom are represented by the AHC, should be permitted to vote on the agreement their counsel and the Debtor already struck.

## STATEMENT OF JURISDICTION

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a), (b) and 1334(a). Appellant timely filed a notice of appeal on September 5, 2023. (A54-56). On September 20, 2023, the Bankruptcy Court certified its order for direct appeal under 28 U.S.C. § 158(d)(2)(A)(i), (iii). (A63-66). This Court granted Appellants'

timely petitions for direct appeal. (A67-68). This Court accordingly has jurisdiction under 28 U.S.C. § 157(d)(2)(A).

**STATEMENT OF ISSUES**[1]

1.      Whether the Ad Hoc Committee of Supporting Counsel, which represents more than 57,000 claimants in the Chapter 11 Case, has standing to appeal the Dismissal Order.[2] <u>Raised</u>: (No. 23-12825, Dkt. No. 1407 at 5 (TCC Issue No. 18)). <u>Objected to</u>: Not applicable.[3] <u>Ruled upon</u>: Not applicable. <u>Proposed Answer</u>: Yes.

2.      Whether LTL's bankruptcy petition, even if not filed in good faith, can be sustained pursuant to section 1112(b)(2) of the Bankruptcy Code in light of the "unusual circumstances" inherent in the Chapter 11 Case. <u>Raised</u>: (No. 23-12825, Dkt. No. 613 (AHC Obj. to Motions to Dismiss)); <u>Objected to</u>: (No. 23-12825, Dkt.

---

[1]      The Ad Hoc Committee of Supporting Counsel joins in and supports the Debtor's brief with regard to its arguments and assertions that (i) the Debtor was in financial distress as of the time it filed its petition, and (ii) alternatively, that the Third Circuit's good-faith analysis in *LTL I* conflicts with the Bankruptcy Code.

[2]      Undefined capitalized terms have the meaning set forth in the remainder of the AHC's Opening Brief.

[3]      Following dismissal of the Chapter 11 Case, the Official Committee of Talc Claimants challenged the AHC's standing to appeal for the first time in its Statement of Issues on Appeal and Counter-Designation of Record (No. 23-12825, Dkt. No. 1407 at 5 (TCC Issue No. 18)).

No. 857 (TCC Reply in Supp. of Mot. to Dismiss)); <u>Ruled upon</u>:  A31-36 (No. 23-12825, Dkt. No. 1127 at 31-36 (Dismissal Opinion)).  <u>Proposed Answer</u>:  Yes.

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

In 2022, the first chapter 11 case of LTL Management, LLC came before this Court after various parties in interest filed appeals from an order of the U.S. Bankruptcy Court for the District of New Jersey denying certain motions to dismiss that chapter 11 case.  *See* (No. 21-30589 (Bankr. D. N.J.)); (Adv. Pro. No. 21-03032 (Bankr. D. N.J.)); *see also In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023) as amended by 64 F.4th 84 (3d Cir. 2023).  In February 2019, Old JJCI's (as defined below) talc supplier, Imerys Talc America, Inc. and affiliates Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc., filed Chapter 11 petitions. *In re Imerys Talc Am., Inc*., No. 19-10289 (Bankr. D. Del.).  In February 2021, talc miner Cyprus Mines Corporation also filed for Chapter 11. *In re Cyprus Mines Corp.*, No. 21-10398 (Bankr. D. Del.).

## **STATEMENT OF THE CASE**

### I.    **The History of the Debtor's Talc Personal Injury Claims**

LTL Management, LLC is an indirect subsidiary of Johnson & Johnson and traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a wholly owned subsidiary of J&J that was incorporated in 1970.  (A208 (*Declaration of John K. Kim in Support of First Day Pleadings*, No. 23-12825

(Bankr. D. N.J. 2023), Dkt. No. 4 at ¶ 13) ("Kim FDD (2023)")).[4] Through a series of inter-company transactions dating back to 1979, J&J transferred all assets associated with its baby products division to J&J Baby Products, and Johnson & Johnson Consumer Inc. ("Old JJCI") later assumed responsibility for all claims alleging that J&J's talc-containing products caused ovarian cancer and mesothelioma. (A208-10 (*Id.* at ¶¶ 15-21)).

Prior to 2010, only a limited number of cases involving cosmetic talc use were filed against Old JJCI and J&J. (A3241 (*Declaration of John K. Kim in Support of First Day Pleadings*, No. 21-30589 (Bankr. D. N.J. 2021), Dkt. No. 5 at ¶ 34) ("Kim FDD (2021)")). After a 2013 trial verdict, however, the number of claims filed against these entities increased precipitously, with more than 1,300 ovarian cancer cases filed over the following two years. (A3241 (*Id.* at ¶ 35)). By October 2021, claimants had filed nearly 40,000 talc-lawsuits against Old JJCI and J&J—including almost 36,000 claimants with filed claims in a federal multi-district litigation ("MDL"), and more than 3,800 claimants with filed claims in multiple state court jurisdictions across the country. (A218 (Kim FDD (2023), ¶ 43)). In those lawsuits, claimants generally assert that (i) samples of Johnson's Baby Powder contain asbestos and talc; (ii) genital application of talcum powder increases the risk of and

---

[4]    Unless otherwise stated, all internal quotations and citations are omitted and all emphasis is supplied.

can cause ovarian cancer; and (iii) exposure to asbestos-contaminated talcum powders can cause mesothelioma. (A3240-43 (Kim FDD (2021), ¶¶ 31-37, 41)).

The increase in talc-related litigation imposed a financial burden on Old JJCI. As of the 2021 Petition Date, Old JJCI had incurred nearly $1 billion in total defense costs, nearly all of which was spent in the preceding five years. (A3242 (*Id.* at ¶ 40)). On top of these costs, Old JJCI also paid $3.5 billion in indemnity in connection with settlements and related verdicts. (A3242 (*Id.*)).

To address its mounting talc-liability, and to "globally resolve [these] talc related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding," Old JJCI engaged in series of transactions under the Texas divisional merger statute pursuant to which Old JJCI ceased to exist and two new companies—LTL and Johnson & Johnson Consumer Inc. ("New JJCI")—were formed in its place. *See* (A210-11 (Kim FDD (2023), ¶ 24); A3234-37 (Kim FDD (2021), ¶¶ 21-25)). LTL assumed responsibility for Old JJCI's talc-related liability and petitioned for chapter 11 relief on October 14, 2021 (the "2021 Petition Date"). (A3248 (Kim FDD (2021), ¶ 61)).

Pursuant to a funding agreement (the "2021 Funding Agreement"), J&J and New JJCI were obligated to pay LTL for its "talc-related liabilities" and "any and all costs and expenses" incurred during LTL's bankruptcy case. (A3267-68 (*Id.*, Annex 2 at 5-6); A213 (Kim FDD (2023), ¶ 32)). According to the Debtor, the

fundamental purpose of the 2021 Funding Agreement was to facilitate the resolution of cosmetic talc claims through a chapter 11 filing by the Debtor, and the terms of the 2021 Funding Agreement limited the Debtor's right to funding from J&J and New JJCI to the amount of the Debtor's aggregate liability for talc related claims, minus the value of the Debtor.  (A213-14 (Kim FDD (2023), ¶¶ 32-33)).

## II.    The 2021 Chapter 11 Case

The 2021 Chapter 11 Case was subsequently transferred to the District of New Jersey and motions to dismiss were filed by various parties—including, but not limited to, the Official Committee of Talc Claimants (the "2021 TCC"), the law firm of Arnold & Itkin LLP ("Arnold & Itkin") on behalf of certain personal injury claimants represented by Arnold & Itkin, and certain other talc claimant constituencies. (A5-6 (*Memorandum Opinion Granting Motions to Dismiss*, No. 23-12825 (Bankr. D. N.J.), Dkt. No. 1127 at 5-6) ("Dismissal Opinion"); A226 (Kim FDD (2023), ¶ 68)). Following a five-day evidentiary hearing, the Bankruptcy Court denied all motions to dismiss, finding that the 2021 Chapter 11 Case was filed in good faith and for a valid reorganizational purpose. *See* (A4519 (*Declaration of John K. Kim* (June 23, 2023), ¶ 12) ("Kim Trial Decl.")); *see also In re LTL Mgmt., LLC*, 637 B.R. 396, 429-30 (Bankr. D.N.J. 2022).

Several parties, including the 2021 TCC and Arnold & Itkin, appealed the Bankruptcy Court's decision (the "2021 Appeals"), and this Court granted the

parties' application for direct appeal in May 2022. On January 30, 2023, this Court issued an opinion and order reversing the Bankruptcy Court's decision. *See In re LTL Mgmt., LLC*, 58 F.4th 738 (3d Cir. 2023) as amended by 64 F.4th 84 (3d Cir. 2023) ("*LTL I*"). Among other things, this Court found that, given the scope of the 2021 Funding Agreement, the 2021 Chapter 11 Case was not filed in good faith due to the Debtor's lack of imminent and apparent financial distress (the "2021 Dismissal"). *LTL I*, 64 F.4th at 110. The Court also held that "unusual circumstances" under section 1112(b)(2) did not preclude dismissal under the facts of that case. *Id.* The Debtor subsequently filed a petition for rehearing and rehearing *en banc*, which this Court denied on March 22, 2023. (A227 (Kim FDD (2023), ¶ 70)).

## III.    The Debtor's Decision to File This Chapter 11 Case

At the time of the 2021 Dismissal in early 2023, the Debtor understood that the number of current claims more than doubled relative to the 2021 Petition Date, with as many as 100,000 current claims pending after the 2021 Chapter 11 Case was dismissed. *See* (A4535 (Kim Trial Decl., ¶ 58)). Amidst this wave of talc litigation, and as the 2021 Appeals were pending, plaintiffs' attorney Mikal Watts approached representatives of LTL and J&J on behalf of his thousands of talc clients to discuss a potential consensual resolution of the Debtor's talc liability. (A4599-600 (*Declaration of James Murdica* (June 22, 2023), ¶¶ 40-41) ("Murdica Decl.");

A4617 (*Declaration of Mikal C. Watts in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss* (June 23, 2022), ¶ 7) ("Watts Decl."); A4621 (*id.* at ¶¶ 25-26); A2324 (June 28 Hr'g Tr., Vol. I (Murdica) at 39:3-9)).

Ultimately, with the assistance of court-appointed mediators, these parties reached terms on a form plan support agreement ("Plan Support Agreement") and supporting plan term sheet, pursuant to which LTL, J&J, and seventeen law firms representing more than 57,000 talc claimants agreed to work together to finalize a plan of reorganization that would fully resolve all current and future talc claims, in a manner that would deliver prompt and equitable payment to their clients and similarly situated claimants. (A4600 (Murdica Decl., ¶¶ 42-43); A4621 (Watts Decl., ¶ 28); A5566 (*Declaration of James G. Onder in Support of Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss* (June 23, 2022), ¶ 28) ("Onder Decl."); A6651-A8978 (Kim Trial Decl., Exs. A-V); A357-1745 (*Verified Statement of Paul Hastings LLP Pursuant to Bankruptcy Rule 2019*, No. 23-12825 (Bankr. D. N.J. 2023), Dkt. No. 470) ("AHC 2019 Statement"); A1759-89 (*First Supplemental Verified Statement of Paul Hastings LLP Pursuant to Bankruptcy Rule 2019*, No. 23-12825 (Bankr. D. N.J. 2023), Dkt. No. 807) ("Supplemental AHC 2019 Statement")).

Those firms later formed the Ad Hoc Committee of Supporting Counsel for the purposes of advocating for their client base in the Chapter 11 Case. Representing a majority of current talc claimants suffering from ovarian cancer, gynecologic cancer, and/or mesothelioma,[5] the AHC is comprised of members of the mass tort plaintiffs' bar with decades of experience in mass tort litigation and, for some, direct involvement in talc litigation leadership more specifically. (A357-1745 (AHC 2019 Statement); A1759-89 (Supplemental AHC 2019 Statement); A5566 (Onder Decl., ¶ 29)). Two of the 17 firms—Nachawati Law Firm (f/k/a Fears Nachawati) and OnderLaw, LLC— previously were counsel to members of the 2021 TCC, and both firms supported dismissal of the 2021 Chapter 11 Case in part due to the Debtor's initial refusal to offer a settlement proposal that would adequately compensate current and future talc claimants. (A4601 (Murdica Decl., ¶ 44); A5565 (Onder Decl., ¶ 23)).

---

[5] Members of the AHC of Supporting Counsel testified to the rigorous intake procedures with which they vet potential talc claimants. (A4617-19 (Watts Decl., ¶¶ 7-18); A5562-63 (Onder Decl., ¶¶ 9-13)). Mr. Watts and Mr. Onder testified that these procedures, which include ordering medical records, employing experts and doctors to analyze the same, and conducting multiple potential client interviews, eliminate non-compensable claims and ensure their clients have compensable claims. (A4618 (Watts Decl., ¶ 12); A2508-09 (June 28 Hr'g Tr., Vol. II (Watts) at 54:24-55:5); A5562-63 (Onder Decl., ¶¶ 12-13)). Thousands of those clients filed suit against J&J and/or Old JJCI prior to the commencement of the 2021 Chapter 11 Case. (A5564 (Onder Decl., ¶ 17)).

A.    **The Debtor's Change in Circumstances**

With the support of these law firms in hand, the Debtor filed the Chapter 11

Case on April 4, 2023 (the "Petition Date"), immediately after dismissal of the 2021

Chapter 11 Case.  (A8 (Dismissal Opinion at 8)).  Consistent with the Plan Support

Agreements, the Debtor's proposed plan of reorganization (including as amended,

the "Plan") calls for the funding of a talc resolution trust with *$8.9 billion net present*

*value*—a more than three-fold increase over the Debtor's commitment in the 2021

Chapter 11 Case.  (A206 (Kim FDD (2023), ¶ 8)).  To fund this proposed settlement,

the Debtor structured a new funding arrangement, which it asserts was necessary to

eliminate the material risk that the 2021 Funding Agreement had been rendered void

or voidable by reason of this Court's decision in *LTL I*, and to assure that LTL had

funding sufficient to satisfy the Plan Support Agreement's financial terms.[6]

Specifically, the Debtor authorized the execution of three agreements to

implement these changes.    (A230-31 (Kim FDD (2023), ¶¶ 79-81); A4545

(*Declaration of Robert Wuesthoff* (June 23, 2023), ¶ 34) ("Wuesthoff Decl.");

A4547-88 (*id.* at Ex. G-I)).  *First,* the Debtor executed a Termination and

---

[6]    *See* (A4546 (Wuesthoff Decl., ¶ 35); *see also* A4532 (Kim Trial Decl., ¶ 50);
A2093 (June 27 Hr'g Tr. (Wuesthoff) at 106:10-16) ("[W]e believed that – the
agreements that we – the previous agreements that would be in support of filing for
the bankruptcy met our objectives of, one eliminating the risk of the
nonenforceability of the first funding agreement and agreeing to the terms of the
Plan Support Agreement to settle all these claims, current and future.")).

Substitution Agreement that terminated the 2021 Funding Agreement, as J&J maintained the 2021 Dismissal frustrated the purpose of the agreement's funding backstop from J&J, which was to facilitate a successful bankruptcy. (A230 (Kim FDD (2023), ¶ 79)).  *Second,* the Debtor executed a new funding agreement (the "2023 Funding Agreement") with New JJCI, now known as Johnson & Johnson HoldCo (NA) Inc. ("HoldCo"), whereby HoldCo would provide funding for the Debtor's talc liabilities and business costs.  (A230-31 (*Id.* at ¶ 80-81)).  *Third*, the Debtor executed a Support Agreement with J&J and HoldCo, pursuant to which J&J would provide a funding backstop only upon the confirmation of a chapter 11 plan consistent with the Plan Support Agreement and related plan term sheet. (A230-31 (*Id.*)).

## B.    The AHC of Supporting Counsel's Intervention & Settlement Progress

On April 19, 2023, the AHC of Supporting Counsel appeared for the first time in the Chapter 11 Case through the undersigned counsel. No party to the Chapter 11 Case contested the AHC's ability to appear and participate therein. Shortly thereafter, the AHC moved to intervene in connection with a related adversary proceeding regarding the extension of an existing preliminary injunction order (the "PI Adversary Proceeding").  (A3128-3141 (*Motion of Ad Hoc Committee of Supporting Counsel to Intervene*, No. 23-01092 (Bankr. D. N.J. 2023), Dkt. No. 104) (the "Intervention Motion")). The Official Committee of Talc Claimants (the "TCC")

opposed the AHC's request. *See* (*Objection of the Official Committee of Talc Claimants to Motion of Ad Hoc Committee of Supporting Counsel to Intervene*, No. 23-01092 (Bankr. D. N.J. 2023), Dkt. 123)).

In support of its right to intervene, the AHC of Supporting Counsel asserted that, "[a]bsent intervention, the AHC of Supporting Counsel's rights—and those of a majority of claimants—[would] be severely impaired because the only entities purporting to speak for the defendant-claimants in [the] Adversary Proceeding [were] the TCC and another ad hoc committee of Non-Consenting Claimants, both of which *oppose[d]* the overall goal of the Chapter 11 Case and, by extension, the interest of the AHC of Supporting Counsel's constituents."   (A3134 (Intervention Motion at 7)).

Acknowledging that the AHC speaks for "potentially tens of thousands of voices who do need to have representation in this case," the Bankruptcy Court granted the AHC of Supporting Counsel's motion to intervene over the TCC's objection.  (A1752 (May 9 Hr'g Tr. at 68:7-15)).  The Bankruptcy Court conditioned its order on a requirement that each law firm member of the AHC of Supporting Counsel confer with their respective talc clients regarding their representation of such clients in the Chapter 11 Case.  (A3142-50 (*Order Granting Motion of Ad Hoc Committee of Supporting Counsel to Intervene in the Adversary Proceeding*, No. 23-01092 (Bankr. D. N.J. 2023), Dkt. No. 138) (the "Intervention Order")).

On June 16, 2023, in satisfaction of the Intervention Order, each law firm member of the AHC of Supporting Counsel submitted a sworn declaration attesting that (i) pursuant to "the terms of [each firm's] engagement with [their] clients, the [law firm member] is authorized to represent its clients in connection with" the Chapter 11 Case, and (ii) the law firm member "provided notice to each of its clients of [the law firm member's] intent to represent the client in [the Chapter 11 Case] and to support, on behalf of the client, the Plan Support Agreement." (A3151-3223 (*Notice of Filing of Certifications of Members of Ad Hoc Committee of Supporting Counsel*, No. 23-01092 (Bankr. D. N.J. 2023), Dkt. Nos. 184, 184-1) ("AHC Certifications")).  Prior to its submission of these certifications, counsel for the AHC of Supporting Counsel also filed a verified statement pursuant to Bankruptcy Rule 2019 detailing—for each client represented by members of the AHC—names, dates of birth, dates of death (if applicable), and information regarding the disease(s) from which each such client suffers.  (A357-1745 (AHC 2019 Statement); A1759-89 (Supplemental AHC 2019 Statement)).

On behalf of those clients, the AHC of Supporting Counsel continued to optimize the Plan and Plan procedures in their discussions with the Debtor throughout the Chapter 11 Case.  Mr. Watts and Mr. Onder testified that, as of June 2023, the Plan had only a few issues left to resolve, and both expected the final proposed plan of reorganization would satisfy their collective 36,000 clients' best

interests in many ways—including by paying money quickly without protracted litigation in the tort system.  (A2480 (June 28 Hr'g Tr., Vol. II (Watts) at 26:12-18; A2510-11 (*id*. at 56:17-57:5); A2573-74 (June 28 Hr'g Tr., Vol. II (Onder) at 119:8-120:3; A2576-77 (*id.* at 122:18-123:22)).  This expectation was informed in part by the parties' settlement in principle with counsel to private lienholders holding around 85-90% of applicable medical liens, which resolution would ensure payments to claimants would be made faster—a primary goal of the AHC of Supporting Counsel. (A2574 (June 28 Hr'g Tr., Vol. II (Onder) at 120:4-19; A2588-89 (*id.* at 134:5-135:25)).

In terms of an ultimate resolution, Mr. Watts testified the parties were at that time on the "two yard line." (A2480 (June 28 Hr'g Tr., Vol. II (Watts) at 26:15-16)). As of June 2023, members of the AHC of Supporting Counsel expected to recommend to their clients that they vote in favor of the Plan once it was finalized. (A2480 (*id.* at 26:12-18); A2512 (*id.* at 58:5-11); A2575-76 (June 28 Hr'g Tr., Vol. II (Onder) at 121:14-122:9); A4015 (Adam Pulaski Dep. Tr. June 14, 2023 at 81:9-15); A4015-16 (*id.* at 81:18-82:6); A4016 (*id.* at 86:14-87:5)).  And it was expected that the vast majority of the AHC of Supporting Counsel's clients would follow their (respective) lawyer's recommendations and vote in favor of the Plan.  (A2329 (June 28 Hr'g Tr., Vol. I (Murdica) at 44:5-22); A2512 (June 28 Hr'g Tr., Vol. II (Watts) at 58:12-20)).

### C.    The 2023 Dismissal Opinion and Order

Beginning on or around April 24, 2023, several parties, (collectively, the "Movants"), including but not limited to the TCC and Arnold & Itkin, filed motions to dismiss the Chapter 11 Case (the "Motions to Dismiss") alleging that the same was not filed in good faith under section 1112(b) of the Bankruptcy Code.[7] The Debtor and the AHC of Supporting Counsel filed omnibus objections to the Motions to Dismiss,[8] the Movants filed replies in support of the Motions to Dismiss,[9] and the Debtor and the AHC of Supporting Counsel filed sur-replies in support of their Objections.[10] On June 27, 2023, the Bankruptcy Court commenced a four-day evidentiary hearing on the Motions to Dismiss. (A13 (Dismissal Opinion at 13)).

On July 28, 2023, the Bankruptcy Court issued its decision, erroneously finding cause for dismissal due to the Debtor's purported lack of imminent and immediate financial distress and wrongly concluding that "bad faith," if found, cannot be cured or justified under section 1112(b)(2) of the Bankruptcy Code. (A39 (*Id.* at 39)).  On August 11, 2023, the Bankruptcy Court entered its Order dismissing the Chapter 11 Case. (A40-41 (*Order Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. 1112(b)*, No. 23-12825 (Bankr. D. N.J. 2023), Dkt. No. 1211)

---

[7]    (A3 (Dismissal Opinion at 3 n.8)).
[8]    (A13 (Dismissal Opinion at 13)).
[9]    (A13 (*Id.* at n.12)).
[10]    (A13 (*Id.* at n.13)).

("Dismissal Order")).  The AHC of Supporting Counsel timely filed its notice of appeal to the District Court on September 5, 2023, (A54-56), less than fourteen days after the Debtor timely filed its notice of appeal on August 24, 2023, (A51-53).

## STANDARD OF REVIEW

An order dismissing a bankruptcy case under section 1112(b) is reviewed for abuse of discretion.  *See In re SGL Carbon Corp*., 200 F.3d 154, 159 (3d Cir. 1999).  To the extent this Court is reviewing the underlying determinations of the Bankruptcy Court, it stands "in the shoes of the district court, applying a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions." *In re IT Group, Inc.,* 448 F.3d 661, 667 (3d Cir. 2006) (citation omitted).  Any misapplication of law to fact is "subject to plenary review because it is, essentially, a conclusion of law." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009).

## SUMMARY OF ARGUMENT

**I.**    The AHC of Supporting Counsel has standing to appeal the Dismissal Order.

**A.**    Consistent with controlling Supreme Court precedent, where, as here, one appellant (the Debtor) has standing to be heard, the Court need not reach a third-party standing question, particularly when that third-party's (the AHC) interests are squarely aligned with the appellant whose standing is not at issue. Because the

Debtor has standing to appeal and the AHC is aligned with the Debtor's relevant positions on appeal, the Court should disregard any standing challenge raised.

**B.** Even if the AHC's standing is independently considered, the "person aggrieved" standard is here met because the AHC collectively represents in this case more than 57,000 talc claimants (the "AHC Clients") that were harmed directly and pecuniarily by reason of the Dismissal Order and is permitted under well-accepted principles of prudential standing to act on their behalf for the purposes of this appeal.

**C.** Apart from the interests of the AHC Clients, the AHC of Supporting Counsel itself independently constitutes a "person aggrieved" by the Dismissal Order because the AHC members have suffered a direct pecuniary harm by reason of the automatic termination of the Plan Support Agreements—pre-petition agreements they entered into with the Debtor—as well as by the material impact the Dismissal Order has had (and will continue to have) on the scope and trajectory of the AHC members' efforts to secure fair and speedy recoveries for all of their affected clients.

**II.** The Bankruptcy Court erred in concluding that section 1112(b)(2) of the Bankruptcy Code did not preclude dismissal.

**A.** Unusual circumstances predominate the Chapter 11 Case. The Debtor faces an ever-building wave of talc litigation with no means to resolve the same on a global basis given the long latency periods in which relevant injuries may manifest

and the fact that it is impossible to identify all possible future claimants. As such, dismissal here is not in the best interest of creditors because it will deprive them of the opportunity to be paid fairly and promptly, as they would if the Plan is confirmed.

**B.**    The Debtor commenced the Chapter 11 Case only after reaching a generational agreement with the AHC of Supporting Counsel, as well as with an understanding that the members of the AHC would work with the Debtor, on behalf of their clients, to finalize a fair settlement for all claimants.  Accordingly, any purported act or omission constituting cause, including the Debtor's alleged bad faith, is justified given the AHC's pre- and post-petition support.

**C.**    Similarly, in light of that support, the significant likelihood that the Debtor will be able to confirm a plan of reorganization should cure any purported lack of good faith on the Debtor's behalf.

**D.**    Given the pre-petition and post-petition progress made by the Debtor before and during the Chapter 11 Case, which progress the Bankruptcy Court rightfully acknowledged, a significant likelihood exists that the Plan will be confirmed within a reasonable timeframe.

## **ARGUMENT**

### I.    The Ad Hoc Committee of Supporting Counsel Has Standing to Appeal the Dismissal Order

As an initial matter, the Court should disregard any attempt by the TCC, which speaks for a loud minority of claimants, to silence the AHC and the more than 57,000

individuals on whose behalf it speaks in this Chapter 11 Case.[11]  As shown below, there is no reason for this Court to question the AHC's standing because the Debtor, with whom the AHC is aligned for all relevant purposes, undoubtedly has standing to appeal the Dismissal Order.   In any event, even if the AHC's standing is independently considered, it plainly constitutes a "person aggrieved" by reason of the Bankruptcy Court's decision below.

### A.    The Third Circuit Need Not Reach the AHC's Standing Given the Debtor's Appeal and the Appellants' Common Arguments

As the Supreme Court has repeatedly made clear, where, as here, one appellant has standing to be heard, the Court need not reach a third-party standing question—especially when that third-party is aligned with the appellant whose standing is not at issue.  *See, e.g., Horne v. Flores*, 557 U.S. 433, 446-47 (2009) ("Because the superintendent clearly has standing to challenge the lower courts' decisions, we need not consider whether the Legislators also have standing to do so."); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State's.").

---

[11]    The AHC addresses this argument now given the TCC's intent, as signaled in its Statement of Issues on Appeal, to seek to dismiss the AHC's appeal for "lack of standing." (*The Official Committee of Talc Claimants' Statement of Issues on Appeal and Counter-Designation of Record*, No. 23-12825 (Bankr. D. N.J. 2023), Dkt. No. 1407 at 5).

This approach has been applied equally to the "person aggrieved" standard specific to bankruptcy appeals, as well as to matters concerning prudential standing more broadly. *See Medford Vill. East Assocs., LLC v. Medford Crossings N. LLC*, No. CIV. 08-4803, 2009 WL 1687165, at *4 (D.N.J. June 15, 2009) (denying appellees' motion to dismiss appeal on grounds that appellant was not "person aggrieved" by bankruptcy court's order because separate appellant had standing to appeal) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 (1977) (court need not reach third-party standing question of whether corporate petitioner could assert rights of its prospective minority tenants because there was "at least one individual plaintiff who has demonstrated standing" to assert such rights as his own)).

This Court should decline to address the TCC's anticipated standing arguments now for the same reasons.  Having executed Plan Support Agreements with the Debtor and objected to the various Motions to Dismiss in hopes that the Debtor would be permitted to fairly compensate all present and future talc victims through a consensual plan of reorganization, the AHC has been squarely aligned with the Debtor throughout the Chapter 11 Case for all relevant purposes.  Because the Debtor's standing is undisputed, the Court need not consider the AHC's standing on an independent basis.

**B.     Even if Standing is Addressed, the AHC Satisfies All Requirements to be Heard Here**

Even if independently considered, the AHC satisfies the "person aggrieved" standard because the AHC speaks for, and represents, the AHC Clients, which were harmed directly and pecuniarily by reason of the Dismissal Order, and is permitted under well-accepted principles of prudential standing to act on their behalf for the purposes of this appeal.

### 1.     The AHC Clients Are "Persons Aggrieved"

One appealing an order of the Bankruptcy Court must be a "person aggrieved" to have standing to be heard, *In re Boy Scouts of America*, 35 F.4th 149, 156-57 (3d Cir. 2022), and this Court has held that appellants are "persons aggrieved" if the order appealed from "diminishes their property, increases their burdens, or impairs their rights." *Id.* at 157 (citation and internal quotation omitted); *see also In re PWS Holding Corp.,* 228 F.3d 224, 249 (3d Cir. 2000) ("[O]nly those whose rights or interests are directly and adversely affected pecuniarily by an order of the bankruptcy court may bring an appeal.").

Much like members of the TCC and persons represented by other Appellees, the AHC Clients are comprised of individuals (or representatives of individuals) who have suffered harm as a result of their exposure to J&J talc products.  They are claimants in this proceeding, represented personally by the law firm members of the AHC, and most likely would, upon confirmation of a plan consistent with the Plan

Support Agreement, be entitled to compensation on account of the harm they have suffered.

Because the Dismissal Order deprived them of their right to pursue their claims in bankruptcy, the AHC Clients, through counsel, appeal from an order that harmed them directly and pecuniarily under the circumstances. *See Ryan Turner Investments v. Jackson Durham Floral-Event Design*, No. 3:20-00400, 2021 WL 602908, at *4 (M.D. Tenn. Feb. 16, 2021) ("It is difficult to conceive of a circumstance in which a creditor with an unresolved claim does not have standing to appeal a dismissal of a bankruptcy."). They are "persons aggrieved" for these reasons.[12]

### 2.    *The AHC Satisfies Third-Party Standing Exceptions*

The AHC of Supporting Counsel is permitted to act on behalf of the AHC Clients on appeal, just as it had before the Bankruptcy Court below, because the AHC satisfies the exception to the general rule against third-party standing, which is designed to ensure that, in "the ordinary course," litigants assert only their own legal rights and interests in litigation. *Singleton v. Wulff*, 428 U.S. 106, 113 (1976); *Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must

---

[12]    For the avoidance of doubt, there was no question as to whether the TCC or other claimant-appellants, including Arnold and Itkin LLP, had appellate standing in *LTL I*.

assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third-parties.") (citations omitted).

In most cases, three elements must be satisfied in order for a party to be granted third-party standing: (i) the litigant must suffer injury; (ii) the litigant and the third party must have a "close relationship;" and (ii) the third party must confront some difficulties that prevent it from pursuing its own claims. *Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 288-89 (3d Cir. 2002). The inquiry is not a bright-line test; rather, the question turns on the facts and circumstances of each case, and courts are instructed to take a balancing approach. *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) (noting courts should perform an "overall balance of factors" to determine third party standing); *see also id.* at 750 ("we do not read the list of factors in *Powers* and *Caplin & Drysdale* as exhaustive; in some cases, other factors may also be relevant to the ultimate prudential decision"); *In re Zohar III, Corp.,* 631 B.R. 133, 187-89 (Bankr. D. Del. 2021) (denying motion to dismiss claim for lack of prudential standing based on "unique facts and circumstances of the . . . bankruptcy cases"). Here, all such elements are met.

***The AHC Has Suffered Injury in Fact.*** As to the first element, a litigant must demonstrate that it has suffered an "injury in fact" that provides it with a "sufficiently concrete interest in the outcome of the issue in dispute." *King v. Governor of N.J.,* 767 F.3d 216, 243 (3d Cir. 2014) (citing *Powers v. Ohio,* 499 U.S.

400, 410 (1991)). "The contours of the injury-in-fact requirement, while not precisely defined, are very generous." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982). The standard is met as long as the party alleges a personal stake in the outcome of the litigation. *In re Global Indus. Techs.*, 645 F.3d 201, 210 (3d Cir. 2011).

Here, the AHC of Supporting Counsel undoubtedly has a "personal stake" in continuing the Chapter 11 Case. Unlike in the tort system, where many of the AHC members experienced first-hand the cost of delay and prospect of uncertain recovery, the Chapter 11 Case provided the AHC members with a unique path toward securing—through their own negotiations with the Debtor—prompt and fair compensation for their respective talc clients on terms consistent with the Plan Support Agreements. Upon dismissal and the occurrence of certain other conditions, however, the Plan Support Agreements were terminated, and the AHC was deprived of the opportunity to finalize that settlement on behalf of their tens of thousands of clients.

The Bankruptcy Court already concluded that the AHC's interests in this regard give rise to Article III standing under the circumstances when it concluded the AHC constituted a "party in interest" in connection with the PI Adversary Proceeding. *See* (A1752 (May 9 Hr'g Tr. at 68:7-15) (ruling that the AHC, "based on [its] representation that each of these law firms do represent the interests of

26

thousands of creditors for whose identity they have supplied . . . satisfy the requirements necessary to intervene in the preliminary injunction consistent with Rule 24(a)(1), 24(a)(2), and [11 U.S.C. §] 1109")).

Because, as the Bankruptcy Court already found, the AHC was eligible to participate in the PI Adversary Proceeding as a "party in interest," a test this Court has found equivalent to the injury-in-fact standard inherent in Article III standing more broadly, the AHC of Supporting Counsel plainly meets this first element of the third-party standing exception. *See In re Global Indus. Techs.,* 645 F.3d at 211 (recognizing that finding "standing under the Bankruptcy Code" via § 1109 necessarily includes finding "Article III standing").

***The AHC's Interests Are Closely Allied with Those of AHC Members' Clients.*** The AHC of Supporting Counsel also satisfies the second element because an existing attorney-client relationship meets the unity of interests necessary to assert the rights of a third party. *See, e.g., Caplin Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989) (finding the attorney-client relationship is "one of special consequence" that satisfies third-party standing requirements).

Here, the record demonstrates that the AHC's interests are entirely aligned with those of their clients. In connection with its successful efforts to intervene, the AHC was required to prepare and file certificates verifying (i) that the members of the AHC were communicating with their clients, (ii) that their clients understood the

AHC members were acting on their behalf in the Chapter 11 Case pursuant to their respective retention agreements, and (iii) that the AHC of Supporting Counsel would, on behalf of all such AHC Clients, pursue confirmation of a plan of reorganization consistent with the PSA. (A3148-49 (Intervention Order)). Having conferred directly with the AHC Clients for those purposes and filed certificates confirming as much, in satisfaction of the Intervention Order, there can be no question that the AHC members and AHC Clients have a unity of interest such that the AHC of Supporting Counsel should be permitted to continue advocating on behalf of those individuals. (A3151-3223 (AHC Certifications)).

***The AHC Clients Are Hindered in Asserting Rights.*** Finally, there also exists a sufficient "hindrance" in this case to justify third party standing given the obvious difficulties inherent in organizing 57,000 or more individual claimants, particularly given the scope and complexity of the Chapter 11 Case. In this Circuit, the "hindrance" or "obstacle" element "does not require an absolute bar from suit[.]" *Pa. Psychiatric Soc'y v. Green Spring Health Servs.,* 280 F.3d at 290. Rather, "[a] practical disincentive to sue may suffice . . . ." *Id.* at 290 n.14. Here, that standard is plainly met.

As the Bankruptcy Court acknowledged in granting the Intervention Motion, the AHC speaks for "potentially tens of thousands of voices who do need to have representation in this case." (A1752 (May 9 Hr'g Tr. at 68:7-9)). Given the unique

scope of the Chapter 11 Case and the sheer number of AHC Clients, it would be impracticable under the circumstances for each of those 57,000 individuals to participate in the Chapter 11 Case. Indeed, as was asserted below, the AHC as currently composed is a far more effective means for the tens of thousands of clients it represents to make their voices heard. *See* (A1750 (May 9 Hr'g Tr. at 54:7-9) (the AHC is "facilitating the voices of 56,000-plus claimants to come before the Court through their law firms"); A1748 (*id.* at 51:8-19) (citing the difficulty of forming and organizing "an ad hoc committee of [56,000 claimants]")).

For these reasons, the challenges inherent in organizing the participation of all such AHC clients constitute a sufficient "hindrance" under the circumstances, even assuming such a showing is required here. *See Caplin,* 491 U.S. at 624 n.3 (finding third-party standing even though litigant suffered no obstacles to advancing his own constitutional claim); *see also Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (no inquiry into obstacle in summarily upholding booksellers' standing to raise book buyers' First Amendment rights in facial challenge to statute).

\*  \*  \*

For all of these reasons, the AHC should be permitted to continue to speak for the AHC Clients on appeal, each of whom suffered directly and pecuniarily as a result of the Dismissal Order, as set forth above. As with other prudential standing

concepts, the "person aggrieved" standard "should not be applied where its underlying justifications are absent." *Singleton v. Wulff*, 428 U.S. at 114. And, here, the AHC's role in the Chapter 11 Case, and now on appeal, actually serves to *further*—not flout—the policy goals inherent in the more restrictive bankruptcy appellate standing rules, by ensuring a more efficient appeals process overall. *See In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) ("Overly lenient standards may potentially over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization."); s*ee also Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 843 F.2d 636, 643-44 (2d. Cir. 1988) (considering the "person aggrieved" standard but concluding that current-claimant appellant in bankruptcy proceeding was not permitted to "assert the rights of [third-party] future claimants" where, unlike here, appellant was not likely to act as a "reliable advocate" for such individuals).

### C.    The AHC of Supporting Counsel Also Constitutes a "Person Aggrieved" In Its Own Right

Even putting aside the interests of the AHC Clients, the AHC of Supporting Counsel also constitutes a "person aggrieved" by the Dismissal Order in its own right. The AHC members have suffered a direct harm by reason of the automatic termination of the Plan Support Agreements, as well as by the material impact the Dismissal Order has had (and will continue to have) on the scope and trajectory of

the AHC members' efforts to secure fair and speedy recoveries for all of their affected clients.  If the Dismissal Order is affirmed, the AHC Members, as counsel, will be forced to return to the tort system, which, in addition to being unfair to the AHC Clients (the paramount concern on appeal), will also increase the costs and burdens of the AHC's members associated with their respective efforts to recover on behalf of the AHC Clients.  Accordingly, the AHC has established that it will suffer a direct pecuniary harm as a result of the Dismissal Order and has standing to be heard before this Court.

## II.    The Bankruptcy Court Erred In Concluding That Section 1112(b)(2) Was Not, And Could Not Be, Satisfied

On the merits, the Bankruptcy Court reversibly erred in concluding that section 1112(b)(2) of the Bankruptcy Code did not preclude dismissal.  Even assuming, contrary to fact and law, that the Bankruptcy Court was justified in finding that the Debtor failed to establish "financial distress," the Chapter 11 Case should not have been dismissed because (i) the unusual circumstances present here make clear that dismissal is not in the best interest of creditors; (ii) the purported "cause" underlying dismissal (x) was justified by the Debtor's conduct and calculation leading up to the Chapter 11 Case, including its obtaining plan support from counsel to a majority of current talc claimants, and (y) would be cured upon confirmation of a Plan consistent with that same agreement; and (iii) the Plan was, just prior to the

Dismissal Order, reasonably likely to be confirmed within a reasonable period of time.

## A.   The Section 1112(b)(2) Exception Applies to "Bad Faith" Dismissals

The Bankruptcy Court erred in the first instance when it concluded that this Court's decision in *LTL I* constituted "binding precedent" that already "establish[ed]" LTL was then and is now "unable to demonstrate either a 'reasonable justification' or a possible timely cure of the grounds for dismissal." (A32 (Dismissal Opinion at 32)). Rather, what this Court found was that, on the basis of the then-present record, it could "not *currently* see how [LTL's] lack of financial distress could be overcome." *LTL I*, 64 F.4th at 110.   Since this Court's decision, however, the facts have materially changed, and on the basis of such new facts, as set forth below, the AHC of Supporting Counsel submits that dismissal would not be in the best interests of creditors pursuant to section 1112(b)(2).[13]   *See United States v. Cardales-Luna*, 632 F.3d 731, 735 (1st Cir. 2011) ("[A] decision dependent upon its underlying facts is not necessarily

---

[13]   For the same reasons, the Bankruptcy Court erred in interpreting *In re SLG Carbon* to mean that section 1112(b)(2) is "reserved for only those who properly belong in bankruptcy." (A35 (Dismissal Opinion at 35)). This is inconsistent with the Court's decision in *LTL I*, which did not foreclose, as a matter of law, the application of this exception to matters in which a debtor failed to demonstrate financial distress.

controlling precedent as to a subsequent analysis of the same question on different facts and a different record.").

For the avoidance of doubt, the Bankruptcy Court also wrongly implied, in dicta, that the section 1112(b)(2) exception should be limited to circumstances in which dismissal is based on "'technical mistakes' or other procedural and ministerial failings." (A35 (Dismissal Opinion at 35)).  Section 1112(b)(1) authorizes courts to "dismiss a case under this chapter …, for cause," which this Court has construed to include a lack of good faith, and section 1112(b)(2) precludes dismissal where "unusual circumstances" so require.

The Bankruptcy Court's suggestion that section 1112(b)(2) may not apply to *any* dismissal on "bad faith" grounds finds no support in the provision itself and overlooks the undisputed proposition that, in assessing whether "bad faith" exists in the first place, courts must "examine the totality of the facts and circumstances and determine where a petition falls along the *spectrum* ranging from the clearly acceptable to the patently abusive." *LTL I*, 64 F.4th at 100. The same is true of the financial distress requirement, which this Court also acknowledged to be a "fine line" in certain cases. *Id.* at 102.

The very nature of this fact intensive inquiry counsels against categorical prohibitions under the circumstances—particularly, here, given the manner in which the "unusual circumstances" test has been interpreted by other courts to focus on the

extent to which creditors may be paid in full.[14] This focus on the *benefit* to creditors in an otherwise "result oriented" analysis[15] should be read to transcend any possible significance among distinctions between certain bases for dismissal, and for that reason this Court respectfully should, as it did in *LTL I*, consider whether the facts of "this case" qualify for exception to dismissal under section 1112(b)(2).[16]

---

[14]    *See* Section II(B), *infra*.

[15]    *In re Korn,* 523 B.R. 453, 468 (Bankr. E.D. Pa. 2014)

[16]    As the Debtor asserted below, and as to which assertion the Bankruptcy Court did not dispute, no court has ruled that the absence of financial distress is never subject to potential justification and cure under section 1112(b)(2).  And while the Appellees, in their Motions to Dismiss, cited cases for the proposition that a bad-faith filing could never be reasonably justified or cured, *see* (*Reply in Support of Motion of the Official Committee of Talc Claimants to Dismiss Second Bankruptcy Petition of LTL Management, LLC*, 23-12825 (Bankr. D. N.J. 2023), Dkt. No. 857 at 70) (citing *Green v. Howard Family Tr. (In re Green)*, No. 15-1349, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9, 2016); *In re Hinesley Family Ltd. P'ship No. 1*, 460 B.R. 547, 553 (Bankr. D. Mont. 2011); *In re Keith*, No. 10-61722-11, 2010 WL 3835003, at *6 (Bankr. D. Mont. Sept. 29, 2010)); *see also* (*Reply in Support of Motion of Arnold & Itkin, on Behalf of Certain Talc Claimants, to Dismiss Chapter 11 Case*, 23-12825 (Bankr D. N.J. 2023), Dkt. No. 854 at 61) (citing *Green*), these cases do not involve a purported lack of financial distress and, thus, are clearly distinguishable.  *See Green*, No. 15-1349, 2016 WL 6699311, at *8 (bad faith based on filing solely to harass judgment creditor); *Hinesley Family*, 460 B.R. at 553-54 (bad faith based on gross mismanagement of financial affairs and failure to disclose encumbrance and dispute with governmental entity); *Keith*, No. 10-61722-11, 2010 WL 3835003, at *7 (bad faith based on, among other things, perjury).

**B.      Unusual Circumstances Exist Such that Dismissal is Not in the Best Interest of the Creditors and the Estate**

Unusual circumstances predominate this Chapter 11 Case in various ways. Section 1112(b) does not define unusual circumstances, "but the phrase contemplates conditions that are not common in chapter 11 cases." *In re Pittsfield Weaving Co.*, 393 B.R. 271, 274 (Bankr. D.N.H. 2008), (citing *In re Fisher*, No. 07-61338-11, 2008 WL 1775123 at *5 (Bankr. D. Mont. Apr. 15, 2008)). "Courts have much discretion in determining whether there are unusual circumstances that weigh against conversion or dismissal." *Id.* at 274-75 (citing *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) (section 1112(b) "explicitly provides for this discretion where a court is able to identify 'unusual circumstances . . . that establish that the requested conversion is not or dismissal is not in the best interests of creditors and the estate'")). Consistent with this approach, and in recognition of the fact that the "unusual circumstances" inquiry is largely "result oriented," (*In re Korn,* 523 B.R. at 468), certain courts have suggested a standard that focuses on facilitating "the course of action that results in the largest number of creditors being paid the largest amount of money in the shortest amount of time." *In re 1121 Pier Village LLC*, 635 B.R. 127, 140 (Bankr. E.D. Pa. 2022).

The Bankruptcy Court assumed, without more, that "unusual circumstances" existed for the purposes of the 1112(b)(2) inquiry.  That assumption was well-founded. As a threshold matter, the Chapter 11 Case was brought to address mass tort liability

vast in scope and mired in complexity, which the defendants are unlikely to be able to resolve on a global basis in the tort system. The products giving rise to those claims were sold by "a company that . . . conducts business in virtually all countries in the world,"[17] and, although talc-based baby powder is no longer sold by affiliates of the Debtor in North America, the resulting talc litigation, like all asbestos related litigation before it, will involve tens of thousands of plaintiffs over many decades to come.[18] Thus, not only is "the pending count of claims . . . likely between 80,000 to 100,000[,]" the latency periods for ovarian cancer and mesothelioma, which some plaintiffs' experts estimate may run as long as sixty years, "will result in thousands of [additional] future claims."[19]

As the expert testimony confirmed, and as the Bankruptcy Court rightly acknowledged, these "unusual" circumstances—i.e., "latency periods for injuries and unknown future claimants"—represent "two insurmountable hurdles to globally resolving the talc litigation in the tort system." (A28 (Dismissal Opinion at 28)). Indeed, Sheila Birnbaum, Esq., whose testimony for the Debtor the Bankruptcy Court credited in its decision, testified that latent injuries make it "impossible to identify who

---

[17] (A213 (Kim FDD (2023), ¶ 31)).

[18] (A217-218 (*Id.*, ¶ 42)).

[19] (A217-218 (*Id.*); A6176 (*Expert Report of Charles H. Mullin, Ph.D.* (June 7, 2023), ¶ 21)).

the plaintiffs are going to eventually be, because they have no injury at the moment, and their injury may manifest years after their exposure to a particular product, substance or device." (A2734 (June 29 Hr'g Tr., Vol. I (Birnbaum) at 81:4-11)).

In addition to concerns regarding latent injuries, Ms. Birnbaum further testified that due process concerns regarding notice and opt out rights have stalled "settlements through class actions" over the last two decades, with no change in this landscape anticipated based on the present circumstances.  (A2743 (*Id.* at 81:12-19) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) (affirming decertification of proposed asbestos class settlement for failure to meet the requirements of Rule 23) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (holding that certification of proposed global asbestos class settlement was impermissible under Rule 23 and that it did not comply with *Amchem*))).

The upshot of this testimony—unrefuted by the Appellees at trial—is that the Dismissal Order, if affirmed, will force talc claimants to return to a system that provides little hope for a fair, global resolution of their claims.  *See* (A30 (Dismissal Opinion at 30) ("In short, the Court remains unconvinced that the procedural mechanisms and notice programs offered in the tort system can protect future claimants' rights in the same manner as the available tools in the bankruptcy system. Given these concerns, the Court considers the possibility that best interests of the creditors warrants continuation of this chapter 11 case.")).  And yet, if the Dismissal Order were reversed,

the opposite result would likely be obtained in bankruptcy. *See In re Korn*, 523 B.R. at 471-72 ("An unusual case would be one in which the disparity between the outcomes … is stark and substantial.").

Indeed, it was precisely for these reasons that two law firms now representing over 25,000 talc claimants abandoned their efforts to oppose LTL's bankruptcy and began working with the Debtor to achieve a global resolution in this proceeding. (A4600-01 (Murdica Decl., ¶ 43-44)).  Messrs. James Onder and Majed Nachawati were aligned with, and counsel to members of, the 2021 TCC during the 2021 Chapter 11 Case, and they supported, both before the Bankruptcy Court and this Court on appeal, the 2021 TCC's efforts to dismiss the 2021 Chapter 11 Case.  (A5565 (Onder Decl., ¶ 22)).

As Mr. Onder testified, however, upon reflecting as of the time of this Court's decision in *LTL I* that "thousands of [his] clients had already been waiting nearly a decade to recover in the tort system," he believed that "rather than returning to protracted and potentially uncertain litigation" in state and federal courts, "a better resolution could be reached through settlement through the bankruptcy process, which would result in expedited compensation for [his] clients and provide a means by which future claimants could more easily recover from the Debtor." (A5565 (Onder Decl., ¶ 23)).

Consistent with this first-hand assessment, as well as with the Bankruptcy Court's own assumed findings, "unusual circumstances" should be found to exist here as it cannot be disputed that bankruptcy offers a means by which talc claimants would receive compensation for their injuries faster and on more fair, negotiated terms. *See In re Wilderness Crossings, LLC*, 440 B.R. 484, 489 (Bankr. W.D. Mich. 2010) (finding unusual circumstances where, among other things, creditors opposed effort to convert bankruptcy case from chapter 11 to chapter 7); *In re Sherwood,* No. 04-50584, 2008 WL 2074098, at *3 (Bankr. W.D. Mo. May 14, 2008) (finding "unusual circumstances" because "dismissal would result in a significant delay in payment for [vast majority of creditors, who] would likely face protracted litigation in one or more state courts").

This is particularly true where, as here, creditors are likely to be paid in full pursuant to the parties' negotiated resolution. *See Korn*, 523 B.R. at 469 ("despite the existence of cause-based prior shortcomings . . . those shortcomings are excusable and chapter 11 offers a convincing prospect that creditors will be paid in full (or in large part, or substantially more than in a chapter 7 liquidation), without the risks of failure typically associated with the implementation of a chapter 11 reorganization plan"); *see also In re Orbit Petroleum, Inc*., 395 B.R. 145, 149 (Bankr. D.N.M. 2008) (filing of plan which proposed to pay all creditors in full constituted unusual circumstances); *In re McTiernan,* 519 B.R. 860, 868-69 (Bankr. D. Wyo. 2014)

(overcoming cause for dismissal based on equity cushion in property subject to secured

claim); *In re New Towne Dev., LLC,* 404 B.R. 140, 147-48 (Bankr. M.D. La. 2009)

(finding unusual circumstances where value of debtor's assets and aggregate claims,

respectively, allowed for likely payment of all unsecured claims and administrative

expenses in full).

For these reasons, and consistent with the Bankruptcy Court's own correct

assumption, this Court respectfully should conclude that "unusual circumstances" exist

such that dismissal would not be in the best interest of creditors.

### C.    Any Purported Act Or Omission Constituting Cause, Including Alleged Bad Faith, is Justified

The Bankruptcy Court erred, however, in holding the Debtor's filing could

never be justified under the circumstances.  As shown *infra,* while this Court concluded

in *LTL I* that it could not "currently see" how the Debtor's lack of financial distress

could be overcome based on the record then before it, the facts at issue in the Chapter

11 Case compel the opposite conclusion.  *See LTL I*, 64 F.4th at 110 (stating that "we

cannot *currently* see how [the Debtor's] lack of financial distress could be overcome"

and holding that no reasonable justification for that distress was available "*in this

case*.") (emphasis added).  Specifically, unlike in *LTL I,* the Debtor was justified in

petitioning for bankruptcy because it did so *only after* securing the support of law firms

representing more than 57,000 present talc claimants, and agreeing with those law

firms to work jointly towards the consummation of a historic, mutually agreeable

plan of confirmation.  (A6638-39 (Kim Trial Decl., ¶¶ 28-29); A6651-8978 (*id.* at Exs. A-V)).

Indeed, as the Bankruptcy Court itself acknowledged, the "impetus" for the Chapter 11 Case "was a proposal by [the AHC of Supporting Counsel] for a bankruptcy resolution of the Debtor's talc liability." (A8 (Dismissal Opinion at 8)). Shortly after this Court's initial decision in *LTL I,* Mikal Watts—counsel to more than 16,000 talc claimants and current member of the AHC—contacted representatives of the Debtor "to discuss a final, global resolution of the talc liability, including all present and future claims, to be efficiently administered through a second bankruptcy by LTL." (A8 (*Id.*))).  As those conversations progressed, other current members of the AHC of Supporting Counsel—including those like Mr. James Onder, who had spent years advocating for talc claimants in the tort system—separately negotiated with Mr. James Murdica, J&J's national settlement counsel, and Mr. Erik Haas, J&J's in-house counsel, regarding terms of a potential agreement to support a mutually acceptable plan of reorganization.  (A8-9 (*Id.* at 8-9); *see also* A4599-600 (Murdica Decl., ¶ 40); A4621 (Watts Decl., ¶ 25); A5565 (Onder Decl., ¶¶ 23-24); A2571-72 (June 28, Vol. II (Onder) at 117:16-118:9)).

Those negotiations resulted in a historic proposed settlement that, once finalized through a confirmed plan of reorganization, would fully resolve all current and future talc claims and provide for prompt payments to present talc claimants.

Specifically, the Debtor, J&J and the AHC of Supporting Counsel came to terms in principle on a plan that would, for the benefit of all current and future talc claimants, fund a trust in the amount of $8.9 billion on a net present value basis, and agreed to work cooperatively in bankruptcy in order to finalize, confirm and consummate a plan of reorganization consistent with those terms. (A4601 (Murdica Decl., ¶ 47); A6638 (Kim Trial Decl., ¶ 28); A6651-8978 (*id.* at Exs. A-V)).

The Debtor commenced the instant Chapter 11 Case only *after* this historic deal was struck and *with* the support of counsel to a majority of present talc claimants, as well as with an understanding that those law firms would work with the Debtor, on behalf of their clients, to finalize a fair settlement in this case. (A8-9 (Dismissal Opinion at 8-9)). Under these unique circumstances, any purported "cause" for dismissal regarding the Debtor's purported lack of financial distress was justified by the prepetition efforts of the AHC and the Debtor—particularly given the "fine line" this Court found to exist between a "proper, early filing," on the one hand, and an "abusive, premature filing," on the other. (A19 (*Id.* at 19) (citing *LTL I*, 64 F.4th at 102)). The record thus satisfies the second required element under section 1112(b)(2).

### D.    Any Purported Act Or Omission Constituting Cause, Including Alleged Bad Faith, Can be Cured

Given the Bankruptcy Court's erroneous refusal to consider whether the "cause" supporting dismissal could, in fact, be cured under the present circumstances, the

Dismissal Order also overlooked facts that plainly meet that standard.    Indeed,

confirmation of the Debtor's proposed Plan—which as set forth *infra* was likely to

have taken place within a reasonable period of time as of the date of the Dismissal

Order—would cure any alleged lack of good faith by the Debtor.

To confirm a plan of reorganization in this case and obtain a channeling

injunction under section 524(g) sufficient to discharge its talc liability overall, the

Debtor would need to secure the support of more than 75% of all outstanding

claimants—i.e., a super-majority of present claimants voting in favor of a deal

consistent with the agreement in principle reached between the Debtor and AHC of

Supporting Counsel.    The Bankruptcy Court would also need to take into account the

input of a future claimants' representative, whose role is to advocate for those future

claimants who are not yet in a position to vote for or against confirmation.    11 U.S.C.

§ 524(g)(4)(B)(i).  One has already been appointed in this Chapter 11 Case. *See* (*Order*

*Appointing Randi S. Ellis as Legal Representative for Future Talc Claimants,* No. 23-

12825 (Bankr. D. N.J. 2023), Dkt. No. 551).

Upon securing such support, which the parties anticipated prior to the Dismissal

Order, the Debtor will have achieved an outcome that is not only consistent with the

interest of a vast majority of talc claimants, but one that also confirms the restorative

purpose of section 524(g) overall. *See* 140 Cong. Rec. S4523 (daily ed. Apr. 20, 1994)

(statement of Sen. Graham) (Congress created section 524(g) to ensure that "debtor[s]

and third parties who are alleged to be liable for [] asbestos claims … [would] be encouraged to participate in a system that will maximize the assets available to pay asbestos claims, present and future, and provide for an equitable distribution and method of payment"); *see also In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 362 (3d Cir. 2012) (finding that the "trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability").

For these reasons, confirmation of a plan consistent with the Plan Support Agreements, which would ensure prompt and fair compensation to all claimants, "can" and in this case *would* cure any purported "bad faith" inherent in the Debtor's filing. *See In re Orbit Petroleum, Inc*., 395 B.R. at 149 (declining to dismiss case filed in bad faith where plan purported to pay creditors in full, but noting that dismissal (rather than conversion) would be appropriate in the event plan was not confirmed by date certain); *see also In re New Towne Dev., LLC,* 404 B.R. at 147-48 (finding dismissal inappropriate where doing so would "reduce the likelihood of payment of the legitimate unsecured creditors' claims").

### E.    There is a Significant Likelihood that the Plan will be Confirmed Within a Reasonable Period of Time

With the Debtor's filing both justified and capable of cure under the present "unusual" circumstances of this Chapter 11 Case, this Court respectfully should reverse the Bankruptcy Court's ruling on section 1112(b)(2) because the Debtor's Plan

was, absent dismissal, also substantially likely to be confirmed within a reasonable period of time.

The Debtor filed its Plan within weeks of commencing the Chapter 11 Case, amended the Plan in consultation with claimant representatives, including the AHC of Supporting Counsel, filed a disclosure statement and prior to dismissal, had a hearing date scheduled for approval of the disclosure statement and solicitation procedures. (No. 23-12825 (Bankr. D. N.J. 2023), Dkt. Nos. 1 (Petition), 525 (Ch. 11 Plan), 912 (Am. Ch. 11 Plan), 1009-1012 (Disclosure Statement and Related Motion for Approval of Disclosure Statement and Solicitation Procedures)). The Bankruptcy Court itself acknowledged this "remarkable progress" made toward a "viable global settlement" in just the first 120 days of the Chapter 11 Case, with the "foundation for a fair, efficient, and expeditious" resolution having been "laid by the dogged efforts of the AHC, Debtor and other parties." (A38 (Dismissal Opinion at 38)).

And while negotiations regarding optimization of the Plan were ongoing throughout the Chapter 11 Case, the parties believed they were on the "two-yard line" as of the time of dismissal. (A2480 (June 28 Hr'g Tr., Vol. II (Watts) at 26:15-16)). Indeed, just days before the hearing on the Motions to Dismiss was conducted, the parties reached a critical settlement in principle regarding medical liens on settlement amounts that claimants would be entitled to receive under the Plan. (A2574 (June 28 Hr'g Tr., Vol. II (Onder) at 120:4-19)). This resolution would have

allowed payments to claimants to be made faster, which was a primary goal of the AHC of Supporting Counsel overall.  (A2588-89 (*Id.* at 134:5-135:25)).

On the basis of this development, as well as the parties' success in negotiating their underlying agreement in principle, members of the AHC of Supporting Counsel were prepared to recommend to their clients that they vote in favor of the Plan once finalized, (A2480 (June 28 Hr'g Tr., Vol. II (Watts) at 26:12-18); A2512 (*id.* at 58:5-11); A2575-76 (June 28 Hr'g Tr., Vol. II (Onder) at 121:14-122:9); A4015 (Adam Pulaski Dep. Tr. June 14, 2023 at 81:9-15); A4015-16 (*id.* at 81:18-82:6); A4016 (*id.* at 86:14-87:5)), and anticipated that the vast majority of the AHC Clients would follow their (respective) lawyer's recommendations and vote in favor of the proposed Plan.  (A2329 (June 28 Hr'g Tr., Vol. I (Murdica) at 44:5-22); A2512 (June 28 Hr'g Tr., Vol. II (Watts) at 58:12-20)).

## <u>CONCLUSION</u>

For all of these reasons, the Ad Hoc Committee of Supporting Counsel has standing to appeal from the Dismissal Order, which should be reversed.

December 13, 2023          Respectfully submitted,

*/s/ Kristopher M. Hansen*
**PAUL HASTINGS LLP**
KRISTOPHER M. HANSEN (*COUNSEL OF RECORD)*
RYAN P. MONTEFUSCO
200 PARK AVENUE
NEW YORK, NY 10166
TELEPHONE: (212) 318-6000
EMAIL: KRISHANSEN@PAULHASTINGS.COM
            RYANMONTEFUSCO@PAULHASTINGS.COM

MATTHEW M. MURPHY
MATTHEW MICHELI
71 SOUTH WACKER DRIVE, SUITE 4500
CHICAGO, IL 60606
TELEPHONE: (312) 499-6000
EMAIL: MATTMURPHY@PAULHASTINGS.COM
            MATTMICHELI@PAULHASTINGS.COM

– AND –

**COLE SCHOTZ P.C.**
MICHAEL D. SIROTA
WARREN A. USATINE
SETH VAN AALTEN
JUSTIN ALBERTO
COURT PLAZA NORTH, 25 MAIN STREET
HACKENSACK, NJ 07602-0800
(201) 489-3000
EMAIL: MSIROTA@COLESCHOTZ.COM
WUSATINE@COLESCHOTZ.COM
SVANAALTEN@COLESCHOTZ.COM
JALBERTO@COLESCHOTZ.COM

– AND –

**PARKINS & RUBIO LLP**

Lenard M. Parkins
Charles M. Rubio
700 Milam, Suite 1300
Houston, TX 77002
Telephone: (713) 715-1660
Email:  lparkins@parkinsrubio.com
        crubio@parkinsrubio.com

*Counsel to Ad Hoc Committee of Supporting Counsel*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.    I am a member in good standing of the Bar of this Court.

2.    This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10516 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3.    This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced 14-point font, using Microsoft Word in a 14-point Times New Roman font in the text and the footnotes.

4.    The text of the electronic Brief is identical to the text in the paper copies.

5.    The electronic file containing the Brief was scanned for viruses using Vipre Virus Protection, version 3.1, and no virus was detected.

DATED: December 13, 2023                 By:    */s/ Kristopher M. Hansen*
                                                Kristopher M. Hansen

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on December 13, 2023. All counsel of record are registered CM/ECF uses, and service will be accomplished by the CM/ECF system.

DATED: December 13, 2023            By:    */s/ Kristopher M. Hansen*
                                            Kristopher M. Hansen